Receipt number AUSFCC-11091947

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

VIRGINIA DEPARTMENT OF ENERGY,

*Plaintiff*,

v.

UNITED STATES OF AMERICA,

*Defendant*.

Civ. No. 26-268 C

**COMPLAINT**

Plaintiff, the Virginia Department of Energy ("Virginia Energy"), by and through its counsel, hereby files this Complaint against Defendant, the United States of America ("United States"), stating the following in support thereof:

1. This case is a breach-of-contract action arising from the U.S. Environmental Protection Agency's ("EPA") decision to unilaterally terminate a competitive grant awarded to Virginia Energy under the Solar for All zero-emissions technologies program ("Grant Agreement"). Virginia Energy's Grant Agreement gave rise to binding contractual obligations between the EPA and Virginia Energy, and Virginia Energy seeks money damages resulting from the EPA's breach.

2. The Solar for All program was established as part of the Inflation Reduction Act of 2022, which amended the Clean Air Act. Pub. Law 117-169, § 60103, 136 Stat. 1818, 2065–66 (Aug. 16, 2022). The newly enacted Section 134 of the Clean Air Act, codified at 42 U.S.C. § 7434, directed the EPA to make competitive grants to States, municipalities, Tribes, and eligible nonprofits "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out

other greenhouse gas emission reduction activities." *Id.* § 7434(a). Congress appropriated $7 billion to fund this grant program, which the EPA subsequently called "Solar for All."

3. On April 22, 2024, after a time- and cost-intensive application process, the EPA announced that it had selected 60 qualified recipients and awarded the $7 billion appropriated by Congress to carry out the Solar for All program. Virginia Energy, a Solar for All grantee in the Commonwealth of Virginia, was among those selected to carry out Congress's mandate.

4. By February 2025, the EPA had entered into a binding Grant Agreement with Virginia Energy and obligated the funding to Virginia Energy from the Solar for All program.

5. Virginia Energy initially received the full amount of its award in its Automated Standard Application for Payment ("ASAP") account and began to perform under the Grant Agreement.

6. On or about August 7, 2025, however, the EPA announced the cancellation of the Solar for All program and unilaterally terminated Virginia Energy's Grant Agreement—a clear, unambiguous, and material breach of the agreement between the EPA and Virginia Energy.

7. A few days later, the EPA withdrew $144,146,214.30 of grant funds from Virginia Energy's ASAP account.

8. The EPA's unilateral termination breached the express terms of Virginia Energy's Grant Agreement, which allowed for termination only in the narrow circumstances of substantial noncompliance that materially impairs performance, adequate evidence of waste, fraud or abuse, or material misrepresentation of eligibility status—none of which occurred.

9. The EPA's actions interfered with Virginia Energy's performance under the Grant Agreement and destroyed Virginia Energy's reasonable expectations regarding the fruits of its Grant Agreement.

10. The EPA purportedly acted based on its misguided understanding of the One Big Beautiful Bill Act ("H.R. 1"), which repealed Section 134 of the Clean Air Act and rescinded only "the *unobligated* balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act)." Pub. L. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025) (emphasis added). Because the Solar for All funds awarded to Virginia Energy were fully obligated well before the enactment of H.R. 1, the balances were not "unobligated" on the day before enactment of H.R. 1 and therefore were not rescinded by that Act.

11. Despite Congress's express decision to rescind only "unobligated balances," the EPA interpreted H.R. 1 as somehow rescinding *all* appropriations related to Solar for All.

12. Not only erroneous as a matter of statutory interpretation, the EPA's view is also erroneous as a matter of contract law: the EPA's interpretation of H.R. 1 does not constitute grounds for termination under the express terms and conditions of the Grant Agreement.

13. By unilaterally cancelling the Grant Agreement without any legally sound justification and seizing the award money from Virginia Energy, the EPA breached the express terms of the Grant Agreement and violated the covenant of good faith and fair dealing.

14. Virginia Energy files this suit to recover money damages for the EPA's breach of the Grant Agreement.

**JURISDICTION AND VENUE**

15. Jurisdiction over the claims advanced in this case is proper in this Court pursuant to 28 U.S.C. § 1491 (the "Tucker Act").[1]

---

[1] Virginia Energy files this action to obtain money damages for Defendant's breach of the Solar for All Grant, and does not waive any rights to challenge any agency action related to Solar for All in any other forum. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660–62 (2025) (Barrett, J., concurring).

## PARTIES

### A. Plaintiff

16. The Virginia Department of Energy is an executive agency for the Commonwealth of Virginia, a sovereign state of the United States of America. Va. Code § 45.2-102. Virginia Energy is the recipient of Grant number (FAIN) 84089801 from the U.S. Environmental Protection Agency ("EPA"). Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

### B. Defendant

17. Defendant is the United States of America, acting through the United States Environmental Protection Agency—an independent agency within the executive branch of the United States government—and its Administrator, Lee Zeldin.

## FACTUAL BACKGROUND

### A. Congress establishes the Greenhouse Gas Reduction Fund

18. On August 16, 2022, the Inflation Reduction Act was signed into law. Pub. Law 117-169, 136 Stat. 1818 (Aug. 16, 2022).

19. One provision of the Inflation Reduction Act created a $27 billion "Greenhouse Gas Reduction Fund" by adding a new Section 13 to the Clean Air Act. Pub. Law 117-169, 136 Stat. 1818, 2065–66 (Aug. 16, 2022), *repealed by* Pub. L. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025).

20. As part of the Greenhouse Gas Reduction Fund, Congress appropriated $7 billion for the EPA to use to support "zero-emission technologies." Pub. Law 117-169, 136 Stat. 1818, 2066 (Aug. 16, 2022). Specifically, Congress directed the EPA "to make grants, on a competitive

basis … to States" (and other "eligible recipients") "for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." *Id.*

21. Congress thereby provided statutory authorization for the EPA's authorized representatives to bind the United States in grant agreements created from the Greenhouse Gas Reduction Fund.

22. Congress appropriated this $7 billion for fiscal year 2022, directed that the EPA begin making grants "not later than 180 calendar days after August 16, 2022," and provided that the appropriated funds would "remain available until September 30, 2024." Pub. Law 117-169, 136 Stat. 1818, 2066 (Aug. 16, 2022). Thus, the EPA had a 2-year period to award the funds that Congress had created.

23. Congress also appropriated $30 million to the EPA—"[i]n addition to amounts otherwise available"—for the "administrative costs necessary to carry out activities under" the Greenhouse Gas Reduction Fund. Pub. Law 117-169, 136 Stat. 1818, 2066 (Aug. 16, 2022).

**B. EPA creates the Solar for All grant program**

24. Beginning in October 2022, the EPA undertook a months-long public stakeholder engagement process to inform its implementation of the Greenhouse Gas Reduction Fund appropriations, including how to design its competitive grant programs. See Richard K. Lattanzio, Cong. Research Serv., IF12387, *EPA's Greenhouse Gas Reduction Fund (GGRF)* 1–2 (May 21, 2024), https://www.congress.gov/crs-product/IF12387.

25. On June 28, 2023, the EPA published a Notice of Funding Opportunity ("NOFO") for the zero-emissions technology competitive grant program, which the agency called "Solar for

All." On August 31, in a revised NOFO, the EPA extended the application deadline, adjusted award size requirements, and made other minor adjustments. EPA, Funding Opportunity No. EPA-R-HQ-SFA-23-01, https://www.grants.gov/search-results-detail/348957. A true and exact copy of the Revised Solar for All NOFO is attached as Exhibit A.

26. The NOFO invited States and other eligible applicants to apply for one of up to 60 Solar for All awards—totaling approximately $7 billion—that would "advance the three overarching [Greenhouse Gas Reduction Fund] program objectives": (1) "Reduc[ing] emissions of greenhouse gases and other air pollutants"; (2) "Deliver[ing] benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities"; and (3) "Mobiliz[ing] financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects." Ex. A at 6–7, 24.

27. To be eligible to apply to the Solar for All competition, applicants were required to submit Notices of Intent that described, among other things, the expected number of applications, the program locations, and the expected amount of funding requested. Ex. A at 18–20. Virginia Energy submitted these Notices of Intent as required by July 31, 2023.

28. Virginia Energy's Solar for All application had to adhere to extensive requirements prescribed by the EPA in the NOFO. Virginia Energy was asked to, among other things: provide a specific program narrative explaining "how you will develop and execute a robust and equitable program that enables the rapid deployment of distributed solar and associated storage with meaningful benefits to low-income and disadvantaged communities"; provide a program administrative narrative describing "how you will administer the grant program and demonstrate you have the policies, procedures, tools, and capabilities to successfully achieve the program goals"; and provide a reporting plan describing a "plan to execute against the grant's reporting

requirements, including tracking and measuring progress in achieving expected environmental outputs and outcomes." Ex. A at 44–49.

29. The NOFO made clear that the competitive Solar for All grant awards were "designed to spur the deployment of residential distributed solar energy to lower energy bills for millions of Americans and catalyze transformation in markets serving low-income and disadvantaged communities." Ex. A at 5. The Solar for All grants were intended to help "transform the clean financing ecosystem in the United States, especially in low-income and disadvantaged communities" and "deliver on the climate and environmental justice goals of the United States." *Id*. As the NOFO recognized, "[p]er Section 134(a)(1) of the Clean Air Act, 100% of all Solar for All funds must be deployed 'to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.'" *Id.*

30. Applications for awards were to be submitted by October 12, 2023, at 11:59 p.m. Ex. A at 39. Virginia Energy submitted an application by this deadline. Virginia Energy's Solar for All Application is attached hereto as Exhibit B.

31. The EPA rated each Solar for All application that met certain threshold criteria under a 245-point rating system. Ex. A at 51. Points were assigned primarily based "on the quality and extent to which [each application] articulates a plan to use grant funds to advance [Greenhouse Gas Reduction Fund] program objectives." See *id.* at 51–62.

32. After the Solar for All grant application period closed in October 2023, the EPA commenced a rigorous, six-month application review process. According to the EPA, "[t]his multi-stage process included review from hundreds of experts in climate, power markets, environmental justice, labor, and consumer protection" from across multiple agencies. U.S. EPA News Release, *Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential*

*Solar, Saving Low-Income Americans $350 Million Annually and Advancing Environmental Justice Across America* (April 22, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential.

33. On April 22, 2024, the EPA announced that it had selected 60 applicants to receive Solar for All grants, including "states, territories, Tribal governments, municipalities, and nonprofits." U.S. EPA News Release, *Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low-Income Americans $350 Million Annually and Advancing Environmental Justice Across America* (April 22, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential. Virginia Energy were among the Solar for All recipients.

34. Between April and August of 2024, the EPA worked with each of the selected applicants to finalize how each Solar for All recipient would operate its Solar for All program, which was memorialized in a Grant Agreement (hereinafter the "Initial Grant Agreement"). A true and exact copy of Virginia Energy's Initial Grant Agreement is attached hereto as Exhibit C.

35. Under the Initial Grant Agreement, the EPA awarded Virginia Energy a sum of money and informed it that "[t]he recipient demonstrates that its commitment to carry out this award by either: 1) drawing down funds within 21 days after EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after EPA award or amendment mailing date." See Ex. C.

36. Virginia Energy also agreed to be subject to an array of requirements in implementing the Initial Grant Agreement. Virginia Energy agreed to, among other things: "submit performance reports and transaction-level and project level data," Ex. C at 7; "only use the award to support … allowable activities" and "not use the award for … unallowable activities, *id.* at 18;

and "ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies," *id.* at 18.

37. The EPA entered into Virginia Energy's initial Grant Agreement pursuant to its statutory mandate to "make grants … for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." Pub. Law 117-169, § 60103, 136 Stat. 1818, 2066 (Aug. 16, 2022).

38. Virginia Energy's Initial Grant Agreement also contained a termination provision in the terms and conditions. The termination provision reads:

> EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR [§] 200.339 and 2 CFR [§] 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR [§] 200.341, EPA must provide the recipient notice of termination.

Ex. C at 30.

39. The Initial Grant Agreement became binding on both parties "21 days after EPA award … mailing date," by the recipient either "drawing down funds" or "not filing a notice of disagreement with the award terms and conditions." Ex. C at 1. For example, the date of Virginia Energy's Grant Agreement was July 17, 2024, so Virginia Energy's Grant Agreement became binding on both parties by August 7, 2024. *Id.*

40. Virginia Energy's Initial Grant Agreement was signed by EPA award official, LaShaun Phillips on behalf of the United States. Ex. C at 1.

41. Virginia Energy's Initial Grant Agreement anticipated that they would spend time working with the EPA to finalize program workplans and budgets before beginning to implement its programs and funding projects in early 2025. See Ex. C at 16–17.

42. Relying on the funds, Virginia Energy negotiated work plans and proposed budgets with the EPA. The work plan process included identifying program areas for funding, detailing how funds would be allocated, and outlining terms and conditions. Until the work plan was approved, Virginia Energy was restricted to drawing down no more than 2% of its obligated funds to ensure that adequate funds would be available for its projects after they were launched to the public. See Ex. C at 1. True and exact copies of Virginia Energy's Solar for All Work Plan is attached hereto as Exhibit D.

43. In December 2024—after Virginia Energy finalized its work plans with the EPA's approval—the EPA issued an Assistance Amendment (hereinafter the "Amended Grant Agreement") that lifted the 2% funding restriction, allowing Virginia Energy to move forward with its programs with the full benefit of its obligated funds. A true and exact copy of Virginia Energy's Amended Grant Agreement is attached hereto as Exhibit E.

44. Virginia Energy's Amended Grant Agreement contained an updated termination provision in the terms and conditions, stating:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to

> another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

Ex. E at 36–37.

45. The termination provision in the Amended Grant Agreement is identical to the one in the Initial Grant Agreement, except that (a) the version of 2 C.F.R. § 200.340 is specified to the version "effective as of October 1, 2024," (b) "material misrepresentation of eligibility status" is added to the grounds for termination; and (c) the EPA agreed to "re-obligate funds to [an] Eligible Recipient" that "assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient."

46. Virginia Energy's Amended Grant Agreement became binding no later than January 10, 2025, "21 days after EPA award . . . mailing date," either by the Plaintiff "drawing down funds" or "not filing a notice of disagreement with the award terms and conditions." See Ex. E at 1.

47. Virginia Energy's Amended Grant Agreement was signed by EPA award official LaShaun Phillips on behalf of the United States. See Ex. E at 1.

48. Through the first months of 2025, Virginia Energy continued to perform under the Grant Agreement. Virginia Energy continued to draw down funds under the Grant Agreement from its ASAP account. True and exact copies of statements from Virginia Energy's ASAP account are attached as Exhibit F.

### C. Congress repeals Clean Air Act § 134 but rescinds only unobligated funds

49. On July 3, 2025, Congress passed a budget reconciliation bill, H.R. 1. Pub. L. 119-21, 139 Stat. 72 (July 4, 2025). Section 60002 of H.R. 1 provides:

> Section 134 of the Clean Air Act (42 U.S.C. [§] 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

139 Stat. at 154.

50. By its explicit terms, H.R. 1 rescinded only "the *unobligated* balances of amounts made available to carry out" section 134 of the Clean Air Act. H.R. 1. Pub. L. 119-21, 139 Stat. 72 (July 4, 2025). Accordingly, any Greenhouse Gas Reduction Fund funds that *were* obligated as of July 3, 2025, were not rescinded.

51. Virginia Energy's funds were all obligated well before July 3, 2025, and were, therefore, not rescinded by H.R. 1.

52. Legislative history further underscores that H.R. 1 did not rescind any obligated funds and likewise did not end the Solar for All program created by those obligated funds.

53. During the markup of the Energy and Commerce Committee title on H.R. 1 on May 13, 2025, Representative Morgan Griffith (R-Va.), then-Chair of the House Energy and Commerce Committee's Subcommittee on the Environment, stated:

> [T]hese provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances. So if a grant was already given, as far as this bill is concerned, then that would still be going forward. . . . If the grant has already been granted and the money is obligated, then . . . then our language does not affect that. . . . [W]e can't rescind expenditures that have already been obligated.

*See* 171 Cong. Rec. S4282–83 (July 9, 2025).

54. Representative Brett Guthrie (R-Ky.), Chair of the House Energy and Commerce Committee likewise explained that H.R. 1 "does not close the grants on any obligated funds." 171 Cong. Rec. S4283.

55. The Budget Committee's Report on H.R. 1 stated that H.R. 1 "would decrease the federal deficit by approximately $104,934 as a result of repealing authorizations and rescinding unobligated funds that were appropriated to the U.S. Environmental Protection Agency (EPA) under the Inflation Reduction Act." Rep. No. 119-106(I), 119th Cong., 1st Sess., at 556 (May 20, 2025). The small amount of deficit reduction envisioned further confirms that H.R. 1 did not rescind the $7 billion in funds already obligated for the entire Solar for All program.

56. In the same report, the minority members agreed that "[t]he budgetary significance of" H.R. 1's "repeal [of] section 134 of the Clean Air Act and resci[ssion] [of] unobligated funds for the Greenhouse Gas Reduction Fund" was "questionable, as only $19 million is available out of the entire $27 billion appropriated. This remaining money is allocated for administrative purposes." ." Rep. No. 119-106(I), 119th Cong., 1st Sess., at 627 (May 20, 2025).

57. After H.R. 1 was enacted, the Congressional Budget Office issued a July 21, 2025, report estimating that repealing and rescinding unobligated funds from all three of the Greenhouse Reduction Fund grant programs would only net $19 million in savings. *See* CBO, *Estimated Budgetary Effects of Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Relative to CBO's January 2025 Baseline*, tab Title VI, lines 19–21 (July 21, 2025), https://www.cbo.gov/publication/61570.

58. Upon information and belief, $19 million is approximately the remaining balance of the funds appropriated for the EPA's administrative costs under 42 U.S.C. § 7434(a)(4).

59. H.R. 1 also did not eliminate the EPA's entire administrative budget. To the contrary, on March 15, 2025, Congress passed a continuing resolution appropriating $3,195,028,000 in funding for "Environmental Protection Agency—Environmental Programs and Management" in fiscal year 2025, which was not touched by H.R. 1.[2] Full Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).

**D. The EPA unilaterally terminates Virginia Energy's Grant Agreement**

60. Beginning in August of 2025—one month after H.R. 1 was enacted—the EPA terminated Virginia Energy's Solar for All Grant Agreement. The EPA did so by sending Virginia Energy a Termination Memorandum and another Assistance Amendment to its Solar for All Grant Agreement (hereinafter the "Termination Amendment").

61. In terminating Virginia Energy's Grant Agreement, the EPA committed a clear and material breach of the Grant Agreement entered between the EPA and Virginia Energy, which expressly limited the grounds for termination to three circumstances: (1) substantial noncompliance with the terms and conditions of the agreement that materially impairs performance; (2) adequate evidence of waste, fraud, or abuse; or (3) material misrepresentation of eligibility status. None of those conditions were satisfied here.

62. The rationale for the EPA's termination was expressed in a Termination Memorandum to Virginia Energy, stating that it was terminating Virginia Energy's Solar for All Grant Agreement. The Termination Memoranda asserted that the EPA intended to terminate

---

[2] Notably, the EPA had requested additional funding for this appropriations account specifically to support administration of the Greenhouse Gas Reduction Fund. U.S. EPA, *Fiscal Year 2025 Justification of Appropriation Estimates for the Committee on Appropriations, Tab 05: Environmental Programs and Management* 40 (March 2024), https://www.epa.gov/system/files/documents/2024-04/fy25-cj-05-epm.pdf.

Virginia Energy's Grant Agreement based on the EPA's interpretation of H.R. 1. A true and exact copy of the Termination Memorandum received by Virginia Energy is attached as Exhibit G.

63. The Termination Memorandum stated that "pursuant to the One Big Beautiful Bill Act (OBBBA)," the EPA was "hereby terminating Assistance Agreement No. 5H-84089801 awarded to the Virginia Department of Energy." Ex. G at 1.

64. The Termination Memorandum further asserted:

> Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. [§] 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)–(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

Ex. G at 1.

65. The Termination Memorandum further provided that the "process for closeout is generally outlined in 2 CFR [§] 200.344," and that the EPA would require certain closeout reports within 120 days of closeout. Ex. G at 1–2.

66. The interpretation of H.R. 1 in the Termination Memorandum aligns with statements by EPA officials, including Administrator Lee Zeldin, that the Solar for All program was terminated because "[t]he One Big Beautiful Bill eliminated the Greenhouse Gas Reduction

Fund." Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025 @ 2:07 p.m.), https://x.com/epaleezeldin/status/1953518426602803684.




67. The EPA's interpretation of H.R. 1 is contrary to the statutory text, which states explicitly that only "the unobligated balances of amounts made available to carry out [Section 134 of the Clean Air Act] (as in effect on the day before the date of enactment of this Act) [were] rescinded." H.R. 1. Pub. L. 119-21, 139 Stat. 154 (July 4, 2025). The legislative history of that provision further confirms that Congress rescinded only the approximately $19 million from the Greenhouse Gas Reduction Fund that had not yet been obligated and had been appropriated directly to the EPA to support its costs in administering Greenhouse Gas Reduction Fund programs.

68. The EPA's erroneous interpretation of H.R. 1 is the only justification the EPA has provided to Virginia Energy for its decision to terminate Virginia Energy's Grant Agreement.

69. In addition to the Termination Memoranda and the Zeldin social media post, the EPA sent Virginia Energy a Termination Amendment to its Solar for All Grant Agreement. A true and exact copy of Virginia Energy's Termination Amendment is attached hereto as Exhibit H.

70. The Termination Amendment stated: "This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added." Ex. H at 1.

71. The Termination Amendment further stated: "Per 2 CFR [§] 200.340 and the Termination General Terms and Conditions of this agreement, the EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions." Ex. H at 1.

72. The Termination Amendment further stated: "The Agency is asserting its right under 2 CFR [§] 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR [§] 200.341." Ex. H at 4.

73. Under 2 C.F.R. § 200.340, a federal award "may be terminated in part or its entirety" in four circumstances: (1) by the federal agency if the recipient or subrecipient fails to comply with the terms and conditions of the award, (2) by all parties if they agree to terminate the award, (3) by the recipient or subrecipient upon sending notice of a reason to terminate the award, or (4) by the federal agency "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(1)–(4).

74. Section 200.340 also provides that a federal agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b).

75. The terms and conditions of the Federal award—contained in Virginia Energy's Initial and Amended Grant Agreement—contain a termination provision that sets forth grounds for termination. The termination provision in the Amended Grant Agreement allows the EPA "to terminate the Assistance Agreement only as specified in 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status." Ex. E at 37.

76. Therefore, the Grant Agreement clearly and unambiguously specifies only three bases for the EPA's unilateral termination—(1) substantial noncompliance that materially impairs effective performance; (2) adequate evidence of waste, fraud, or abuse; or (3) material misrepresentation of eligibility status.

77. The EPA has never alleged (nor could it) that Virginia Energy is in substantial noncompliance with the terms and conditions of its Grant Agreement; that there is any evidence of waste, fraud, or abuse; or that Virginia Energy has materially misrepresented its eligibility status.

78. In terminating Virginia Energy's Grant Agreement without satisfying the conditions provided in the termination clause, the EPA breached the Grant Agreement.

### E. Virginia Energy did not submit an administrative dispute to EPA, but such disputes are not required.

79. The Termination Amendment provided that "[i]f the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to EPA Award Official within 21 days after EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the

recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk." Ex. H at 1.

80. Separately, the Termination Memorandum announcing the cancellation of Solar for All provided:

> If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR [§] 1500.15.

Ex. G at 2.

81. Although Virginia Energy chose not to submit administrative disputes in response to the Termination Memorandum, neither the Grant Agreement nor applicable statutes or regulations require the exhaustion of administrative remedies or otherwise obtain an administrative decision before initiating an action in this Court.

82. Moreover, requiring Virginia Energy to continue pursuing its administrative claims before litigating its Tucker Act claims would be futile, inadequate, and result in irreparable injury. *See Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F. 2d 90, 105–07 (D.C. Cir. 1986).

### F. The EPA begins the closeout process for Solar for All Grant Agreements

83. On or about October 1, 2025, the EPA emailed Virginia Energy information about Closeout Instructions for the Solar for All Program. A true and exact copy of the Closeout Instructions are attached hereto as Exhibit I.

84. The Closeout Instructions provide that "[t]he award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition." Ex. I.

85. The Closeout Instructions further provide that "[m]oving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant." Ex. I.

86. The Closeout Instructions require that Virginia Energy submit reports to the EPA "[w]ithin 120 calendar days of the end of the performance period (the date of termination that is listed in the award amendment)." Ex. I.

### G. The EPA's actions harmed Virginia Energy

87. The EPA has terminated Virginia Energy's Grant Agreement, ordered Virginia Energy to stop working, seized large sums of money from Virginia Energy's ASAP accounts, and frozen remaining balances in Virginia Energy's ASAP accounts, all causing harm to Virginia Energy.

88. Within one week of terminating Virginia Energy's Grant Agreement, the EPA withdrew $144,146,214.30 from Virginia Energy's ASAP account.

89. For example, on August 6, 2025, Virginia Energy's ASAP account had an available balance of $154,975,457.75. On August 11, Virginia Energy's ASAP account had an available balance of only $10,829,243.45. Ex. F at 1, 2.

90. The EPA seized Virginia Energy's grant money without notice, without reasoning, and without explanation for the amount of money taken.

91. The EPA restricted Virginia Energy's use of the remaining grant money in its ASAP account to "allowable" costs for financial obligations incurred prior to the termination date. See Ex. G at 2.

92. The EPA's actions—including terminating Virginia Energy's Grant Agreement and ordering Virginia Energy to stop work—harmed Virginia Energy even beyond the loss of the funds awarded in the Grant Agreement. Virginia Energy was expecting to use its Solar for All award to serve 15,400 low-income households, reducing electrical bills by over 20%. With the loss of the previously obligated funds, Virginia Energy will no longer be able to offer zero-interest solar loans, accelerated solar leases, and grants for enabling upgrades to low-income homeowners; grants and bridge loans that would enable solar on affordable multifamily properties; and grants to enable community solar projects delivering savings and serving low-income households and incorporating meaningful benefits such as community ownership and workforce development initiatives. Additionally, Virginia Energy will no longer be able to offer the anticipated opportunity of reduced energy costs to state-subsidized public housing properties.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Virginia Energy's Grant Agreement

93. Virginia Energy incorporates by reference the allegations contained in the preceding paragraphs.

94. To recover for breach of contract, Virginia Energy must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

95. Virginia Energy's Solar for All Grant Agreement is a binding contract that contemplates money damages.

96. Virginia Energy's Solar for All Grant Agreement was entered into by EPA officials with authority to bind the United States.

97. The EPA breached the express terms of Virginia Energy's Grant Agreement by wrongfully terminating the Grant Agreement.

98. Virginia Energy's Solar for All Grant Agreement contained a provision by which the EPA agreed to make a specified amount of federal funds available for Virginia Energy's Solar for All projects.

99. In the Amended Grant Agreement, the EPA and Virginia Energy mutually agreed to limit the EPA's unilateral termination rights under 2 C.F.R. § 200.339 and 2 C.F.R. § 200.340 to situations involving substantial noncompliance that materially impairs performance; adequate evidence of waste, fraud, or abuse; or a misrepresentation of eligibility status.

100. Specifically, the termination provisions in Virginia Energy's Grant Agreement provide as follows:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, *when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status*, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination.

Ex. E at 36–37 (emphasis added).

101. Under the express terms of the Grant Agreement, the EPA could issue a unilateral termination based only on (1) substantial noncompliance that materially impairs performance; (2) evidence of waste, fraud, or abuse; or (3) a material misrepresentation of eligibility.

102. The bases for EPA's termination of Virginia Energy's Grant Agreement did not include substantial noncompliance that materially impaired performance; evidence of waste, fraud, or abuse; or a material misrepresentation of eligibility status.

103. Instead, the EPA wrongfully terminated Virginia Energy's Solar for All Grant Agreement, purportedly based on the EPA's erroneous interpretation of H.R. 1. See Ex. G at 1.

104. The EPA's unilateral terminations breached the express terms of Virginia Energy's Grant Agreement because the termination provisions in the Grant Agreement did not allow the EPA to issue unilateral terminations based on its interpretation of H.R. 1, let alone based on its erroneous interpretation.

105. The EPA's breach of Virginia Energy's Solar for All Grant Agreement has caused Virginia Energy to suffer damages in an amount to be determined at trial.

**COUNT II**
**Breach of the Duty of Good Faith and Fair Dealing**

106. Virginia Energy incorporates by reference the allegations contained in the preceding paragraphs.

107. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)) (other citation omitted).

108. The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

109. Virginia Energy's Solar for All Grant Agreement is a binding contract that contemplates money damages.

110. Virginia Energy's Solar for All Grant Agreement was entered into by EPA officials with authority to bind the United States.

111. The Solar for All Grant Agreement contained a provision by which the EPA agreed to make a specified amount of federal funds available to Virginia Energy for its Solar for All projects.

112. Virginia Energy entered into the Grant Agreement with the EPA with the reasonable expectation that the EPA would comply with the terms of the Grant Agreement and that the EPA would act in good faith and deal fairly with Virginia Energy.

113. The EPA breached the Grant Agreement's implied duty of good faith and fair dealing.

114. The EPA breached this implied duty by, among other things, targeting Virginia Energy's Grant Agreement for unilateral termination based on an erroneous and bad faith interpretation of H.R. 1, directing Virginia Energy to stop work under the Grant Agreement, withdrawing funds already awarded to Virginia Energy (without prior notice or explanation), preventing Virginia Energy from spending money already awarded to them, and imposing new terms and conditions on Virginia Energy.

115. The EPA's actions interfered with Virginia Energy's performance under the Grant Agreement and destroyed Virginia Energy's reasonable expectations regarding the fruits of its Grant Agreement.

116. Upon information and belief, the EPA's actions were intended to interfere with Virginia Energy's operation of the Solar for All program despite lacking any legal authority to do so.

117. The EPA's actions caused Virginia Energy to suffer substantial damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Virginia Energy prays that this Honorable Court enter judgment against the United States as follows:

i. Awarding money damages to Virginia Energy in an amount to be determined at trial;

ii. Award any allowable pre- and post-judgment interest;

iii. Awarding Virginia Energy its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

iv. Granting other such relief as this Court may deem proper.

Dated: February 17, 2026

Respectfully submitted,

**JAY JONES**
Attorney General of Virginia

By: */s/Darrell W. Kuntz, III*_
Darrell W. Kuntz, III (VSB: 95491)
*Assistant Attorney General*
Katherine Kulbok (VSB: 90853)
*Assistant Attorney General*
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 225-3643
dkuntz@oag.state.va.us
kkulbok@oag.state.va.us

*Counsel for the Virginia Department of Energy*